# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

_____

Nº 16-CV-7127 (JFB)
_____

TREINA FOOKS,

Plaintiff,

VERSUS

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF SOCIAL SECURITY,

Defendant.

_____

**MEMORANDUM AND ORDER**
January 17, 2018
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Treina Fooks ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA") challenging the final decision of the Commissioner of Social Security (the "Commissioner") [1] denying plaintiff's application for social security disability benefits. (ECF No. 1.) An Administrative

Law Judge ("ALJ") determined that plaintiff had the residual functional capacity to perform certain "sedentary work" as defined in 20 C.F.R. 404.1567(a). [2] The ALJ determined that plaintiff is further limited to unskilled tasks in a low-stress job. The ALJ then determined that there were a significant number of jobs in the national economy that suited plaintiff's limitations, and, therefore,

---

[1] Plaintiff commenced this action against Carolyn W. Colvin, who was then the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of the Court is directed to substitute Nancy A. Berryhill, who now occupies that position, as defendant in this action.

[2] The ALJ specified the following exceptions to the sedentary work that plaintiff can perform: no climbing

of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching, or crawling. The ALJ also determined that certain environmental limitations exist: plaintiff must avoid exposure to hazards such as moving machinery and unprotected heights, as well as concentrated exposure to irritants such as fumes, odors, dust, gas, and poorly ventilated areas.

that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review.

Plaintiff now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (ECF No. 7.) The Acting Commissioner opposes the motion and cross-moves for judgment on the pleadings.

For the reasons set forth below, the Court denies plaintiff's motion for judgment on the pleadings, and grants the Acting Commissioner's cross-motion for judgment on the pleadings.

## I.   FACTUAL BACKGROUND

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. (ECF No. 6.) A more exhaustive recitation is contained in the parties' submissions to the Court and is not repeated herein.

A.  Personal and Work History

Plaintiff was born in 1970 and was 42 years old at the onset of her disability on October 16, 2012. (AR at 12, 72.) Plaintiff received a high school education, and completed a year of college. (*Id.* at 37.) Plaintiff's past relevant work history includes participating in a work-study program at Suffolk County Community College, caring for the elderly and disabled at an elderly care home, working as a customer service representative at a promotional company, working as a teacher's aid in the Central Islip School District, and working as a certified nurse's assistant at the Patchogue Nursing Center. (*Id.* at 38-41.) Plaintiff was working at the elderly care facility on October 16, 2012 when she stopped working due to a fall that she alleges caused injury to her foot, ankle, and lower back. (*Id.* at 43.)

During her hearing before ALJ Patrick Kilgannon on June 16, 2015, plaintiff reported that she lived with her 20-year-old daughter. (*Id.* at 42.) On a typical day after her injury, plaintiff stated that she performed personal care, did laundry, cleaned in places that did not require bending or climbing, and watched television, read, and wrote. (*Id.* at 20, 178.) Plaintiff reported that she would go out two to three times a week and that she could travel alone by walking or using public transportation. (*Id.* at 20.) Plaintiff reported that she had a driver's license but did not own a car. (*Id.* at 177, 178.) Plaintiff reported that she could go food shopping and pay her bills, and that she would spend time with others approximately two times a month. (*Id.* at 20.) She reported that she had no problems getting along with family, friends, neighbors, and authority figures, and that she could follow spoken and written instructions. (*Id.*) Plaintiff reported that she was taking medication including Latuda, Setrasaline, Lodapine, and Lumigan. (*Id.* at 55.)

B.  Relevant Medical History

Plaintiff was admitted to Southside Hospital on October 16, 2012. (*Id.* at 223.) Plaintiff's chief complaints were of left ankle injury, ankle swelling, and ankle pain that she sustained from a fall that occurred "just prior to presentation" at the hospital. (*Id.*) Plaintiff reported that her only past medical history was a "history of hypertension." (*Id.*) The hospital record indicated that plaintiff had a normal respiratory rate and was alert and oriented to time, person, and place. (*Id.* at 224.) The record indicated that, upon a nursing assessment of plaintiff's lower left leg, plaintiff denied numbness/tingling and had a full range of motion. (*Id.*) The same document indicated that plaintiff rated her pain as a six out of ten. (*Id.* at 225.) Plaintiff's psychological assessment revealed that plaintiff reported no thoughts of suicide in the prior two months, and had never attempted to commit suicide. (*Id.*) Plaintiff was discharged with an ankle stirrup splint and was instructed to follow up with a doctor

in two to three days. (*Id.* at 226.) A radiology report from this hospital visit found a "widening of the first [sic] second cuneiform joint space which may indicate a Lisfranc fracture. Remaining osseous structures intact." (*Id.* at 227.) The radiology report also states that "[n]o facture is seen. The tibiotalar articulation appears intact. The medial malleolus and lateral malleolus each appear intact. Soft tissues are intact." (*Id.* at 228.)

Plaintiff was examined by Jhansi Rao, M.D. ("Dr. Rao") on October 18, 2012. (*Id.* at 230.) At this time, plaintiff reported a pain level of moderate, rated four to six. (*Id.*) Dr. Rao reported normal respiratory movements and normal breathing sounds. (*Id.* at 231.) Dr. Rao also reported that plaintiff was oriented to time, place, and person. (*Id.*) Dr. Rao told plaintiff to treat the injury with ice, rest, compression, and elevation. (*Id.*)

Plaintiff was examined by Paul Dicpinigaitis, M.D. ("Dr. Dicpinigaitis") on November 5, 2012. (*Id.* at 247.) Plaintiff's chief complaints were injury to her left ankle, with acute onset of pain, some swelling, and difficulty walking/bearing weight on her ankle. (*Id.*) Plaintiff reported a pain rating of nine out of ten. (*Id.*) Dr. Dicpinigaitis performed X-rays on plaintiff's left leg and foot. (*Id.*) No X-ray showed any obvious fractures, dislocations, or gross arthropathies. (*Id.*) Dr. Dicpinigaitis noted that plaintiff had a history of lower back pain. (*Id.*) Plaintiff was also complaining of "bilateral leg numbness, weakness, and tingling, especially in the area of the ankle/feet." (*Id.*) Upon physical examination of plaintiff, Dr. Dicpinigaitis noted that plaintiff walks with an antalgic gait. (*Id.* at 248.) He also noted a slightly restricted range of motion of plaintiff's ankle due to pain and swelling, yet plaintiff's ankle was stable to gentle stress upon examination. (*Id.*) Regarding plaintiff's back pain, Dr. Dicpinigaitis noted

"some" pain and restricted terminal range of motion and terminal flexion and extension. (*Id.*) Lumbosacral spine was stable to stress on examination. (*Id.*) Plaintiff was prescribed Motrin and Percocet for pain control purposes and instructed to begin physical therapy/rehabilitation for her ankle. (*Id.*) Plaintiff was also instructed to follow up regarding her back pain (*Id.*)

Dr. Rao followed up with plaintiff on November 12, 2012. (*Id.* at 233.) Plaintiff reported that her pain level was moderate, rated eight to nine out of ten. (*Id.*) Plaintiff reported a history of asthmatic bronchitis and asthma. (*Id.* at 234.)

Dr. Dicpinigaitis followed up with plaintiff on December 26, 2012. (*Id.* at 250.) Plaintiff still complained of left ankle pain. (*Id.*) Dr. Dicpinigaitis noted that plaintiff continued to walk with a mild antalgic gait at normal walking speed. (*Id.* at 251.) Plaintiff was prescribed a CAM walker/fracture boot at this time, and was advised to continue physical therapy and rehabilitating her ankle. (*Id.*)

Dr. Dicpinigaitis followed up with plaintiff again on January 7, 2013. (*Id.* at 252.) At that time, plaintiff had had an MRI of both her ankle and her lumbosacral spine. (*Id.*) Dr. Dicpinigaitis wrote that he identified from plaintiff's ankle MRI a chronic achy FL tear with scar remodeling. (*Id.*) He also identified lower lumbar spondylosis with left-sided foraminal disc protrusion at L4-5 contacting the exiting left L4 nerve root. (*Id.*) Plaintiff received an injection in her left ankle of a lidocaine/steroid preparation and was told to continue physical therapy for her ankle and back. (*Id.* at 253.)

Plaintiff was examined by an independent medical examiner, Robert Moriarty, M.D. ("Dr. Moriarty") on January 8, 2013. (*Id.* at 236.) Dr. Moriarty's inspection of plaintiff's

left foot revealed no visible deformities. (*Id.* at 238.) Further inspection revealed tenderness over the dorsolateral aspect of the foot to palpation, mild weakness to ankle dorsiflexion, a plantar flexion of five out of five strength, and no instability. (*Id.*) Dr. Moriarty concluded that plaintiff was "temporary moderate partial (50%)" disabled. (*Id.*)

Dr. Dicpinigaitis followed up with plaintiff on March 11, 2013. (*Id.* at 255.) Plaintiff noted "some initial improvement" in symptoms from the cortisone injection from her last follow-up visit. (*Id.*) Plaintiff also noted that her ankle pain could still reach up to eight to nine out of ten. (*Id.*) Dr. Dicpinigaitis advised plaintiff that, at that time, she should either accept her symptoms as they were, or consider surgical intervention. (*Id.* at 256.)

Plaintiff was examined by Daniel Brandenstein, D.O. ("Dr. Brandenstein") on March 26, 2013. (*Id.* at 245.) Plaintiff's chief complaint was lumbago, and that the pain had been worsening. (*Id.*) Plaintiff stated that aggravating factors were standing, lying down, and activity in general, and that there were no alleviating factors. (*Id.*) Plaintiff claimed that her pain at examination was approximately eight to nine and, at its worst, ten. (*Id.*) Dr. Brandenstein found that plaintiff's leg motor strength was "easily" five out of five, and range of motion was "actually relatively well maintained" with forward flexion to approximately 45-50 degrees. (*Id.* at 246.) Dr. Brandenstein noted that her MRI demonstrated some lumbar degenerative changes at L4-5 and L5-S1. (*Id.*)

Dr. Brandenstein followed up with plaintiff on July 2, 2013. (*Id.* at 242.) At this time, plaintiff was seen for her back pain. (*Id.*) Dr. Brandenstein noted visible signs of depression (tearfulness). (*Id.*) Plaintiff stated that she was depressed due to her chronic pain. (*Id.*) Plaintiff was prescribed Cymbalta and advised to see Dr. Elaine Schaefer for psychiatric follow-up. (*Id.* at 242, 243.)

Plaintiff was examined by Elaine Schaefer, D.O. ("Dr. Schaefer") on July 29, 2013. (*Id.* at 430.) Plaintiff reported herniated discs in her back and a sprained left ankle. (*Id.*) Plaintiff reported that her ankle "still hurts her and gets swollen," and that the pain was worse with movement. (*Id.*) Dr. Schaefer noted that she was referred by orthopedics (Dr. Brandenstein) because plaintiff found that she was "crying all the time," and had a lack of motivation. (*Id.*) Plaintiff reported a history of depression. (*Id.*) Plaintiff reported that her concentration was "not good," and that she had trouble paying attention. (*Id.*) Plaintiff reported having "a loss of interest in doing things." (*Id.*) Plaintiff reported that she did not have suicidal or homicidal ideations or plans. (*Id.*) Plaintiff reported that she was interested in restarting medication, and that she was optimistic that she would feel better in the future and was optimistic for her future. (*Id.*) In a psychiatric exam, Dr. Schaefer noted that plaintiff was oriented to person, place, and time. (*Id.* at 432.) Plaintiff's insight and judgment were reportedly intact. (*Id.*) Dr. Schaefer also noted that plaintiff had no eye pain, no eyesight problems, no shortness of breath, no wheezing, and no cough. (*Id.* at 431.) Dr. Schaefer prescribed Zoloft to help plaintiff with her depression. (*Id.*)

Dr. Schafer examined plaintiff again on October 4, 2013. (*Id.* at 427.) Plaintiff reported that she was already feeling better on Zoloft, but asked for her prescription to be refilled for continued use. (*Id.*) Plaintiff reported that she was examined by a psychiatrist for evaluation and was advised to stay on Zoloft. (*Id.*) Plaintiff's daughter was present for this examination, and noted a positive difference in plaintiff. (*Id.*) Plaintiff

reported that she was eating and sleeping well. (*Id.*) Plaintiff reported that her concentration was better and that she felt more active and more positive than she had at her previous visit with Dr. Schaefer. (*Id.*) Plaintiff reported that she did not have suicidal or homicidal ideations or plans. (*Id.*) In a psychiatric exam, Dr. Schaefer noted that plaintiff was oriented to person, place, and time. (*Id.* at 429.) Plaintiff's insight and judgment were reportedly intact. (*Id.*) Dr. Schaefer also noted that plaintiff had no eye pain, no eyesight problems, no shortness of breath, no wheezing, and no cough. (*Id.* at 428.) Dr. Schaefer re-prescribed Zoloft to treat plaintiff's depression. (*Id.*)

Plaintiff was examined by Paul Herman, Ph.D. ("Dr. Herman") for a psychiatric evaluation on October 23, 2013. (*Id.* at 260.) Dr. Herman noted as background information the fact that plaintiff left work in 2012 due to medical, not psychiatric difficulties. (*Id.*) Dr. Herman's notes about plaintiff's psychiatric history include that plaintiff had not been hospitalized or treated for psychiatric reasons, but includes her recent prescription of psychiatric medication sertraline though a general M.D. (*Id.*) Dr. Herman noted that plaintiff's "current functioning" included difficulty falling asleep and staying asleep due to sleep apnea, varying appetite, and occasional tearfulness when ruminating about her life difficulties, including her financial problems, medical problems, lack of work, uncertain future, and chronic pain. (*Id.*) Plaintiff also reported that she was experiencing a lack of motivation. (*Id.* at 261.) Dr. Herman noted that no other psychiatric or psychological symptoms were reported. (*Id.*) Dr. Herman noted that plaintiff's thought process was coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the setting. (*Id.*) Plaintiff reported no significant difficulties with activities of daily living related to psychological or psychiatric issues.

(*Id.*) Dr. Herman wrote that from a psychological/psychiatric perspective, there did not appear to be evidence of significant limitation with respect to plaintiff's ability to follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks, and make appropriate, simple, work-related decisions. (*Id.* at 262.) Dr. Herman did note, however, that there did appear to be evidence of moderate limitation with respect to plaintiff's ability to perform complex tasks and appropriately deal with stress. (*Id.*) Dr. Herman concluded that plaintiff's psychiatric problems did not appear to be significant enough to interfere with her ability to function on a daily basis. (*Id.*)

Plaintiff was examined by Saadia Wasty, M.D. ("Dr. Wasty") on November 18, 2013. (*Id.* at 265.) Plaintiff's chief complaints were lower back and ankle pain. (*Id.*) Plaintiff rated her back pain as an eight or nine out of ten. (*Id.*) Plaintiff stated that nothing relieved the pain. (*Id.*) Plaintiff rated her ankle pain to be seven or eight out of ten. (*Id.*) Plaintiff stated that she found relief with rest and elevation. (*Id.*) Plaintiff stated that she had had asthma since 1987, but had not had any admissions to the hospital for asthma. (*Id.*) Plaintiff stated that she had an inhaler, and experienced shortness of breath on heavy exertion. (*Id.*) Plaintiff also stated that she had had depression since 1987. (*Id.* at 266.) Plaintiff had had no hospitalizations due to depression, and denied suicidal or homicidal ideations. (*Id.*) Plaintiff also stated that she was diagnosed with glaucoma in 2004. (*Id.*) Plaintiff stated that she had intermittent pain in her right eye, which was associated with visual color changes, and was aggravated with reading. (*Id.*) Plaintiff rated her pain as a five to seven out of ten. (*Id.*) Dr. Wasty noted that plaintiff had a normal gait, but had difficulty walking on her heels or toes. (*Id.* at 267.) Plaintiff did not use an

assistive device, and was able to rise from a chair without difficulty. (*Id.*) Dr. Wasty noted that plaintiff's lumbar spine flexion was 80 degrees, extension 10 degrees, and lateral flexion 30 degrees bilaterally. (*Id.* at 268.) Dr. Wasty noted full range of motion of hips, knees and ankles bilaterally. (*Id.*) Dr. Wasty noted no redness, heat, swelling, or effusion. (*Id.*) In a medical source statement, Dr. Wasty found that plaintiff had moderate to marked limitation to squatting and kneeling, and moderate limitation to long periods of sitting, standing, walking, bending forward, and heavy lifting. (*Id.* at 269.) Dr. Wasty further found that plaintiff should avoid heavy exertion due to asthma, and avoid environments with smoke, dust, and all known respiratory irritants due to asthma. (*Id.*) Dr. Wasty recommended a psychological evaluation. (*Id.*)

Plaintiff was examined by Robert Hecht, M.D. ("Dr. Hecht") on January 13, 2014. (*Id.* at 301.) Dr. Hecht reported that plaintiff had tenderness in the lumbar spine and restricted range of motion. (*Id.*) Dr. Hecht also noted that plaintiff had tenderness and restricted range of motion with her left ankle. (*Id.*) Dr. Hecht diagnosed plaintiff with lumbosacral sprain-strain and derangement of the left ankle, "secondary to a work injury that occurred on October 16, 2012." (*Id.*)

Dr. Hecht followed up with plaintiff on January 27, 2014. (*Id.* at 300.) After examining the MRI results of plaintiff's left ankle and spine, Dr. Hecht noted that plaintiff had a chronic anterior talofibular ligament tear in her left ankle, and disc protrusion L4-L5 contacting the L5 nerve root in her lumbar spine. (*Id.*) Dr. Hecht noted the same tenderness and restricted range of motion in both the lumbar spine and left ankle as at previous visits. (*Id.*)

Dr. Schaefer examined plaintiff at a follow-up visit on February 14, 2014. (*Id.* at 424.) Plaintiff reported feeling "much better" on Zoloft. (*Id.*) Plaintiff reported that she had no crying episodes while on Zoloft, and that she had become more social. (*Id.*) Plaintiff reported that her family had noticed a positive change in her. (*Id.*) Plaintiff reported that her concentration was better and that she was doing better at work. (*Id.*) Plaintiff reported that she had a "better attitude." (*Id.*) Plaintiff reported that her appetite was "so-so." (*Id.*) Plaintiff reported that she did not have suicidal or homicidal ideations or plans. (*Id.*) In a psychiatric exam, Dr. Schaefer noted that plaintiff was oriented to person, place, and time. (*Id.* at 426.) Plaintiff's insight and judgment were reportedly intact. (*Id.*) Plaintiff was re-prescribed Zoloft. (*Id.*)

Dr. Hecht followed up with plaintiff on April 14, 2014. (*Id.* at 365.) Dr. Hecht noted the same tenderness and restricted range of motion in both the lumbar spine and left ankle as at previous visits. (*Id.*) Dr. Hecht injected Depo-Medrol 80mg and Lidocaine to plaintiff's right lower lumbar paravertebral trigger point. (*Id.*) Dr. Hecht noted that plaintiff was not interested in physical therapy or further pain management. (*Id.*)

Plaintiff was examined by Dr. Schaefer again on April 21, 2014. (*Id.* at 421.) Plaintiff reported having received injections into her back and left ankle from Dr. Hecht. (*Id.*) Plaintiff reported that she did not find that physical therapy was helping. (*Id.*) Dr. Schaefer noted plaintiff's history of depression, as well as her Zoloft prescription. (*Id.*) Plaintiff reported "feeling great on it," and that she felt "a lot calmer." (*Id.*) Plaintiff's daughter, who was present for the examination, also reported a positive change in plaintiff's behavior. (*Id.*) Plaintiff reported being more energetic and in better spirits. (*Id.*) Plaintiff reported that she was eating and sleeping well. (*Id.*) In a psychiatric examination, plaintiff was reportedly oriented to person, time, and

place. (*Id.* at 422.) Plaintiff's insight and judgment were intact and her mood was normal. (*Id.*) Plaintiff was reportedly talkative and pleasant, and had good eye contact. (*Id.*) Plaintiff's patient health questionnaire ("PHQ") calculated a severity index of 2, and a diagnosis of "minimal" depression. (*Id.*) In her assessment, Dr. Schaefer noted "depression" and renewed plaintiff's Zoloft prescription. (*Id.* at 423.)

Dr. Hecht followed up with plaintiff on June 23, 2014. (*Id.* at 370.) Plaintiff reported that the injection Dr. Hecht administered in her lumbar spine at the last visit did not help. (*Id.*) Dr. Hecht noted the same tenderness and restricted range of motion in plaintiff's left ankle and lumbar spine as at earlier visits. (*Id.*) Dr. Hecht administered another injection of Depo-Medrol 80mg and Lidocaine into plaintiff's ankle. (*Id.*) Dr. Hecht reported that the procedure was well tolerated. (*Id.*) Dr. Hecht recommended lumbar orthosis for better control of plaintiff's back pain and orthosis for the left ankle to better control the pain and increase stability. (*Id.*)

Plaintiff returned to see Dr. Hecht on July 21, 2014. (*Id.* at 375.) Plaintiff reported that the injection she received on June 23, 2014 in her left ankle had helped, and that she would like to try one for her back. (*Id.*) Dr. Hecht noted the same tenderness and restricted range of motion in both the lumbar spine and left ankle as at previous visits. (*Id.*) Dr. Hecht administered the same injection to plaintiff's left lower lumbar paravertebral trigger point as he had to plaintiff's ankle. (*Id.*) Dr. Hecht noted that the procedure was well tolerated. (*Id.*)

Plaintiff was examined by Hanna Ehab, M.D. ("Dr. Ehab") on August 6, 2014. (*Id.* at 460.) During a depression screening, plaintiff took a patient health questionnaire and got a score of 9, mild depression. (*Id.*)

Plaintiff reported little interest or pleasure in "doing things," and several days of feeling down, depressed or hopeless. (*Id.*) In this questionnaire, plaintiff reported that nearly every day she had trouble falling or staying asleep, or that she was sleeping too much. (*Id.*) Plaintiff reported that nearly every day she felt tired or had little energy. (*Id.*) Plaintiff reported that nearly every day, she had a poor appetite or was overeating. (*Id.*) Plaintiff reported that "several days" she felt bad about herself or that she was a failure, or had let her family down. (*Id.*) Plaintiff reported that "several days" she had thoughts that she would be better off dead or of hurting herself in some way. (*Id.*) Plaintiff reported that she ran out of psychiatric medication a month prior, but did not follow up with the psychiatrist. (*Id.*) Plaintiff also reported that, in the few days prior to her visit, she had had negative thoughts and cried a lot. (*Id.*) In a review of her symptoms, plaintiff denied shortness of breath at rest and shortness of breath with exertion, and denied wheezing. (*Id.* at 461.) Dr. Ehab refilled plaintiff's prescription for sertraline for her depression, and referred her to psychiatry. (*Id.* at 464.)

Dr. Moriarty examined plaintiff again on September 2, 2014. (*Id.* at 441.) Plaintiff reported receiving injections from Dr. Hecht to her lower back and left ankle. (*Id.* at 442.) Plaintiff reported pain and stiffness to her left ankle. (*Id.*) Plaintiff reported that her ankle felt unstable when she walked for long distances. (*Id.*) Plaintiff reported pain in her lower back that radiated down her left leg. (*Id.*) Plaintiff also reported the sensation of tingling in her left lateral calf and left ankle and the outer aspect of her left foot. (*Id.*) Dr. Moriarty noted that there was tenderness over the lateral aspect of the ankle in response to palpation. (*Id.* at 443.) Dr. Moriarty also noted that range of motion testing to the ankle revealed a mild restriction in dorsiflexion, a mild restriction in plantar flexion, and a mild restriction in eversion. (*Id.*) Dr. Moriarty

noted that plaintiff's left foot demonstrated mild weakness to dorsiflexion. (*Id.*) Dr. Moriarty noted that plaintiff walked with a slight limp on her left side. (*Id.*) Dr. Moriatry's impression was a left ankle sprain/strain with chronic ongoing symptomatology. (*Id.*) Dr. Moriarty noted that the best treatment for plaintiff at this point would be a self-directed home exercise program, efforts at weight loss, and the use of an ankle support brace. (*Id.* at 444.) Dr. Moriarty found that plaintiff appeared to have achieved maximal medical improvement as to her ankle injury, and that the case was "amenable to a scheduled loss of use regarding the left ankle." (*Id.*) Dr. Moriarty found that, due to the chronic ankle sprain with persistent pain and some motion loss, plaintiff demonstrated a 20% scheduled loss of use of the left foot. (*Id.*)

Plaintiff was admitted to the Catholic Charities Mental Health Services clinic in Bay Shore ("Catholic Charities"), New York, on September 19, 2014. (*Id.* at 273-90.) While at this mental health services facility, plaintiff was examined by nurse practitioner Anastasia Blanchard, the admitting physician was licensed clinical social worker Krista Ann Hoefling, and Isabel Tolentino, M.D. ("Dr. Tolentino") signed Ms. Blanchard and Ms. Hoefling's report. (*Id.*)

Plaintiff followed up with Dr. Hecht on October 13, 2014. (*Id.* at 379.) Dr. Hecht noted the same tenderness and restricted range of motion in both the lumbar spine and left ankle as at previous visits. (*Id.*) Dr. Hecht advised plaintiff to start physical therapy and use a straight cane to walk. (*Id.*) Plaintiff was not interested in another injection at this time. (*Id.*)

Plaintiff was examined by Ms. Hoefling at the Catholic Charities Mental Health Services clinic on October 20, 2014. (*Id.* at 472.) Plaintiff reported an increase in depression over the past year since her ex-husband had died. (*Id.*) Plaintiff reported a poor appetite, and that she was sleeping too much. (*Id.*) Plaintiff reported that she had no motivation and low self-esteem. (*Id.*) Plaintiff reported isolating and passive suicidal ideation. (*Id.*) Plaintiff reported past sexual, physical and verbal abuse, and past manic moods. (*Id.*) Plaintiff reported that she had felt depressed for most of her life, and that she attempted suicide at the age of 12 when she took pills from her mother's cabinet. (*Id.*) Plaintiff reported that she was fired from her job as a home health aide because of her depression. (*Id.*) Plaintiff reported a history of physical abuse/neglect, verbal/emotional abuse, sexual abuse/molestation, and being a witness to violence and witnessing domestic violence, but plaintiff did not wish to discuss the details at that time. (*Id.* at 474-75.)

Plaintiff followed up with Dr. Hecht on November 10, 2014. (*Id.* at 392.) Dr. Hecht noted the same tenderness and restricted range of motion in both the lumbar spine and left ankle as at previous visits. (*Id.*) Dr. Hecht administered the same injection to plaintiff's left ankle, and prescribed a trial of Mobic 15mg to be taken once a day. (*Id.*)

Plaintiff had a psychiatric evaluation on November 12, 2014, performed by Ms. Blanchard at Catholic Charities. (*Id.* at 276.) In this evaluation, plaintiff reported that she had experienced increased depression for the past year, poor appetite, no motivation, isolation, passive suicidal ideation, and low self-esteem. (*Id.*) Plaintiff also reported past sexual, physical, and verbal abuse, past manic moods, and that she heard and had had conversations with a voice, but no one was there. (*Id.*) Plaintiff also reported that she had felt depressed for most of her life, and that she attempted suicide at the age of 12. (*Id.*) Plaintiff also alleged past sexual abuse from family members, including her

biological father, her mother's friend, her uncle, and two of her friends. (*Id.* at 277.) Plaintiff also reported a bed-wetting problem, from age five until age 30. (*Id.*) Plaintiff reported a prolonged problem with comprehension. (*Id.*) Plaintiff scored 100% on a mood disorder questionnaire. (*Id.* at 278, 280.) Plaintiff reported passive suicidal ideation, no current plan or intent, and that she often thinks about her children. (*Id.* at 278.) When asked what her goals were, plaintiff stated that she wanted to manage her depression better. (*Id.* at 282.)

Plaintiff was examined by Jalil Anwar, M.D. ("Dr. Anwar") on December 12, 2014, for her sleeping problems. (*Id.* at 293.) Plaintiff underwent a polysomnography examination with a home sleep test. (*Id.*) After the test, Dr. Anwar diagnosed plaintiff with "severe obstruction sleep apnea with hypoxemia." (*Id.*) Due to this diagnosis, plaintiff was prescribed and instructed to use a continuous positive airway pressure ("CPAP") machine when sleeping. (*Id.*)

Dr. Hecht examined plaintiff again on December 22, 2014. (*Id.* at 399.) Plaintiff reported that the injection administered to her left ankle at her last visit helped "a little bit." (*Id.*) Dr. Hecht noted the same tenderness and restricted range of motion in both the lumbar spine and left ankle as at previous visits. (*Id.*) Dr. Hecht administered the same injection into plaintiff's left lower lumbar paravertebral trigger point. (*Id.*)

Plaintiff was examined by Gary Kelman, M.D. ("Dr. Kelman") on January 23, 2015. (*Id.* at 448.) Plaintiff reported to Dr. Kelman that she was receiving treatment with physical therapy three times per week, and chiropractic care once a month. (*Id.*) Plaintiff also reported to Dr. Kelman that she was provided with medical supplies, which included a back brace, an ankle brace, and a cane. (*Id.*) Plaintiff reported that she was specifically fitted for the durable medical equipment, which she received from her orthopedic doctor. (*Id.*) Plaintiff reported that she used the equipment "as often as possible." (*Id.*) Plaintiff reported that she was "not really" better now than she when she started the treatment. (*Id.*) Plaintiff rated her pain as an eight out of ten. (*Id.*) Plaintiff reported that she could walk one-half city block without too much pain, and that she had difficulty with stairs. (*Id.*) Plaintiff reported that she could sit for ten to fifteen minutes without much pain. (*Id.*) Plaintiff stated that the pain worsened with reaching overhead, bending, and walking. (*Id.*) Dr. Kelman noted a mild limp and mild antalgic gait to the left leg. (*Id.*) In the range of motion testing for her lumbar spine, plaintiff had a flexion of 50 degrees, normal being 60 degrees, an extension of 20 degrees, normal being 25 degrees, a right lateral bending of 20 degrees, normal being 25 degrees, and a left lateral bending of 20 degrees, normal being 25 degrees. (*Id.*) In the left foot/ankle range of motion testing, plaintiff had a dorsiflexion of 10 degrees, normal being 20 degrees, plantar flexion of 35 degrees, normal being 40 degrees, an inversion of 20 degrees, normal being 25 degrees, and an eversion of 15 degrees, normal being 20 degrees. (*Id.*) Dr. Kelman diagnosed plaintiff with back pain and left ankle/foot sprain/strain. (*Id.*) Dr. Kelman reported that plaintiff was capable of returning to work with the following causally related restriction: no prolonged walking/standing, excessive stair climbing, vertical ladders, squatting, repetitive bending, or lifting over 40 lbs. (*Id.*)

Dr. Hecht examined plaintiff again on February 16, 2015. (*Id.* at 405.) Plaintiff reported that the injection she had received at her last visit in her lower left back had helped. (*Id.*) Dr. Hecht noted the same tenderness and restricted range of motion in both the lumbar spine and left ankle as at previous visits. (*Id.*)

Dr. Hecht examined plaintiff again at a follow-up visit on March 30, 2015. (*Id.* at 409.) Dr. Hecht noted the same tenderness and restricted range of motion in both the lumbar spine and left ankle as at previous visits. (*Id.*) Dr. Hecht administered the same injection to the left ankle that plaintiff received at previous visits. (*Id.*) Dr. Hecht advised plaintiff regarding treatment through physical therapy and proper care for her injuries. (*Id.*) Dr. Hecht also prescribed Flexeril 10mg three times a day as needed, and advised plaintiff not to work or drive when taking this medication if it made her drowsy. (*Id.*) Dr. Hecht also prescribed Ibuprofen 800mg three times a day as needed. (*Id.*)

Dr. Tolentino filled out a mental impairment questionnaire regarding plaintiff on July 9, 2015. (*Id.* at 527.) Dr. Tolentino reported that she was seeing plaintiff for individual therapy twice a month. (*Id.*) Dr. Tolentino reported that plaintiff had been attending the clinic since October 20, 2014. (*Id.*) Plaintiff had reportedly canceled nine appointments to date. (*Id.*) When asked to describe the clinical findings that demonstrate the severity of plaintiff's mental impairment and symptoms, Dr. Tolentino noted "mood depressed, affect full, speech clear, thought process logical, perception within normal limits, admits to auditory hallucinations, insight + judgment WNL [within normal limits]." (*Id.*) When asked to identify plaintiff's signs and symptoms, Dr. Tolentino checked boxes for the following: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; thoughts of suicide; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes;

hallucinations or delusions; emotional lability; manic syndrome; and sleep disturbance. (*Id.* at 528.)

When asked about plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting, Dr. Tolentino checked the boxes corresponding with plaintiff's "mental abilities and aptitudes needed to do unskilled work" as follows: (1) unlimited or very good ability to: remember work-like procedures, work in coordination with or proximity to others without being unduly distracted, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and be aware of normal hazards and take appropriate precautions; (2) unable to meet competitive standards: understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention for two-hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in a routine work setting, and deal with normal work stress. (*Id.* at 528-29.)

When asked about plaintiff's "mental abilities and aptitudes needed to do semiskilled and skilled work," Dr. Tolentino noted that plaintiff was unable to meet competitive standards for all of the following: understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, and deal with stress

of semiskilled and skilled work. (*Id.* at 529.) When asked about plaintiff's "mental abilities and aptitude needed to do particular types of jobs," Dr. Tolentino noted that plaintiff has unlimited or very good abilities to: interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (*Id.*) Dr. Tolentino also noted that plaintiff did not have a low IQ or reduced intellectual functioning. (*Id.* at 529-30.) Dr. Tolentino was also asked to indicate to what degree the next categories of functional limitations identified existed as a result of plaintiff's mental impairments, and noted that plaintiff had: a marked limitation[3] for restriction of activities of daily living, difficulties in maintaining social functioning, and deficiencies of concentration, persistence, or pace. (*Id.*) Dr. Tolentino noted that she anticipated that plaintiff would miss more than four days per month on average from work due to her impairments or treatment. (*Id.* at 531.) When asked to describe any additional reasons that plaintiff would have difficulty working at a regular job on a sustained basis, Dr. Tolentino noted that plaintiff had auditory hallucinations that interfered with her functioning. (*Id.*)

C. Relevant Testimonial Evidence

During an administrative hearing on June 16, 2015, plaintiff testified that, on October 16, 2012, she fell and injured her foot, ankle, and lower back. (*Id.* at 43.) Plaintiff testified that these conditions had not improved significantly since their onset. (*Id.*)

Plaintiff testified that with regard to her left foot and ankle, her symptoms included numbness, stiffness, and constant pain, and frequent swelling in her ankle. (*Id.* at 43-44.) Plaintiff testified that nothing caused her left ankle to swell, that it "just d[id]." (*Id.* at 43.) Plaintiff described the pain in her left ankle as a "dull pain most of the time," and said that sometimes she had a "tingling sensation." (*Id.* at 44.) Plaintiff rated her pain to be an eight or nine out of ten. (*Id.*) Plaintiff testified that the pain improved only when she received injections, and would then stay better for approximately a week. (*Id.*)

Plaintiff testified that her back pain symptoms included a "dull numbing feeling." (*Id.*) Plaintiff initially testified that "no activity cause[d] it to get worse," but then corrected herself and stated that "bending, stretching, [and] actually sitting" caused her back pain to worsen. (*Id.* at 45.)

Plaintiff testified that she also had high blood pressure, glaucoma, and asthma. (*Id.*) Plaintiff testified that she took medication for her high blood pressure, and that the medication "somewhat" improved it. (*Id.*) Plaintiff testified that she took drops twice a day for her glaucoma. (*Id.*) Plaintiff further testified that her symptoms from glaucoma included spots in her vision, and that she experienced blackouts during which her "vision [would] get[] dark." (*Id.* at 45-46.) Plaintiff testified that she had had asthma since she was 15 or 16 years old. (*Id.* at 46.) With regard to her asthma, plaintiff testified that, on a bad day, she would lose her breath and "lose consciousness of where [she was]" and that she would "lose a slight form of consciousness." (*Id.*) Plaintiff testified that these losses of consciousness did not happen often, but that she did experience shortness of breath often. (*Id.*) Plaintiff testified that when she experienced shortness of breath, she would sit down, takes deep breaths, and uses her inhaler, and that her inhaler "help[ed]." (*Id.* at 47.)

---

[3] A "marked limitation" means more than moderate but less than extreme.

Plaintiff testified that she was being treated for psychiatric conditions at Catholic Charities.[4] (*Id.* at 47-48.) Plaintiff testified that her psychiatrist, Dr. Tolentino, diagnosed her with depression and bipolar disorder. (*Id.* at 48.) Plaintiff testified that she heard voices, and had been hearing them "for years now." (*Id.*) Plaintiff testified that the voices got worse after her fall, and even worse after her ex-husband passed away. (*Id.* at 49.) Plaintiff testified that the medication she had been prescribed for these psychiatric conditions had helped, but that it had not stopped the voices. (*Id.*) Plaintiff testified that, with regard to her depression, she still got tearful "a lot." (*Id.*) Plaintiff testified that symptoms of her depression included not "want[ing] to do anything . . . just want[ing] to lay in [her] bed, stay in the house and shut down." (*Id.*) Plaintiff testified that she could stay in the house and in bed for a month, and that she had done so in the past, with the most recent time ending "four or five days ago." (*Id.* at 50.) Plaintiff estimated that on average, she had 20 to 25 "bad days" a month due to her depression. (*Id.* at 50-51.)

Plaintiff testified that, during 2013, while she was participating in a work-study program, she missed two or three days due to her physical or psychiatric issues. (*Id.* at 51.) Plaintiff testified that, on some days when she was present, she was not "mentally there." (*Id.* at 51-52.)

Plaintiff testified that she could only sit for up to 20 minutes at a time before "experiencing severe pain and needing to change positions." (*Id.* at 52.) Plaintiff further testified that she could stand for only "a minute or two at the most" before experiencing severe pain. (*Id.*) Plaintiff testified that she could only walk ten steps before having to stop due to pain. (*Id.*)

Plaintiff testified that she had trouble bending over. (*Id.*) She stated that she could do it, "but it hurt[]." (*Id.* at 52-53.) Plaintiff also testified that she had problems lifting and carrying objects, and that she could not lift more than ten pounds. (*Id.* at 53.) Plaintiff testified that she had problems lifting things over her head, and could only do so with objects that weighed less than ten pounds. (*Id.*)

Plaintiff testified that her past job in telephone sales required her to sit all day (*Id.* at 53-54.) Plaintiff further testified that, since her injury in 2012, she could not go back to the job in telephone sales because she "c[ould not] sit for a long period of time" and the job required her to sit for longer than 20 minutes. (*Id.* at 54-55.) When asked if she could do a job that would allow her to stand and sit as desired, plaintiff testified that she could not because she was "always constantly in pain." (*Id.* at 55.) Plaintiff testified that the only job she would be able to do would be one that was "at [her] own pace out of an office." (*Id.*)

Plaintiff testified that her medications included Latuda, setrasaline, lodapine, and Lumigan. (*Id.*)

Plaintiff testified that, between October 2013 and May 2014, she was working part-time, about ten hours a week, as part of a work-study program with Suffolk County Community College. (*Id.* at 56-57.) She testified that her job duties included answering phone calls, copying documents, and filing paperwork. (*Id.* at 57.)

Esperanza DeStefano, an impartial vocational expert, also testified at the administrative hearing. (*Id.* at 12, 56.) The ALJ asked Ms. DeStefano to consider a hypothetical individual of the same age, education, and work experience as plaintiff,

---

[4] The ALJ asked if plaintiff was being treated at "Catholic Charities," or "the Bayside Medical Health Center or something," referencing the Catholic

Charities Mental Health Services clinic in Bay Shore, New York. (AR at 47-48.)

with a light exertional limitation, meaning the individual could lift up to twenty pounds occasionally, lift or carry up to ten pounds frequently, stand or walk for approximately six hours per eight-hour workday and sit for approximately six hours per eight hour work day with normal breaks, no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps or stairs, occasional balancing, stooping, kneeling, crouching, and crawling. (*Id.* at 61-62.) The ALJ limited the work environment to avoid concentrated exposure to irritants such as fumes, odors, dusts, gases, and poorly ventilated areas. (*Id.* at 62.) The ALJ also limited the work to unskilled tasks in a low-stress job, which the ALJ defined as having only occasional decision-making required and only occasional changes in the work setting. (*Id.*) Ms. DeStefano testified that, given such limitations, plaintiff's past work experience would be eliminated as a possibility. (*Id.*) Ms. DeStefano testified that an individual with the above-mentioned limitations would be able to do the job of a mail clerk, and that there were 2,181 positions for that job nationally. (*Id.* at 62.) Ms. DeStefano also identified the job of an office helper as one that the hypothetical individual would be able to perform. (*Id.*) Ms. DeStefano testified that there were 3,588 office helper positions nationally. (*Id.*) Finally, Ms. DeStefano identified the job of electrical equipment assembler as one that the hypothetical individual would be able to perform, of which there were 5,208 positions nationally. (*Id.* at 62-63.)

The ALJ then gave Ms. DeStefano another set of limitations similar to the first set, but changed it to a "sedentary exertional limitation," meaning the individual could lift up to ten pounds occasionally, stand or walk for approximately six hours per eight-hour workday, and sit for approximately six hours per eight-hour workday with normal breaks, while maintaining the other postural,

environmental, and mental limitations previously stated. (*Id.* at 63.) Ms. DeStefano testified that the hypothetical individual with the above-mentioned limitations would be able to perform the job of a table worker, of which there were 2,721 positions nationally. (*Id.*) Ms. DeStefano also identified the job of a document preparer as one that the hypothetical individual would be able to perform, of which there were 45,835 positions nationally. (*Id.*) Last, Ms. DeStefano identified the job of an addresser as one that the hypothetical individual could perform, of which there were 7,338 positions nationally. (*Id.* at 64.) Ms. DeStefano testified that most employers have an absentee policy that would permit an individual to be absent from work a maximum of two days a month. (*Id.*)

Plaintiff's position is that the medical evidence as a whole would indicate in this case that plaintiff "would not be able to remain on task due to her psychiatric and chronic pain condition as well as the asthma, within the tolerance set forth by the expert." (*Id.* at 71.) Plaintiff's position is also that her absences would exceed the absences within the tolerance set forth by Ms. DeStefano. (*Id.*)

## II.  PROCEDURAL BACKGROUND

### A. Administrative History

Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act on June 24, 2013, alleging disability beginning October 16, 2012. (*Id.* at 12.) Plaintiff's application was denied initially on November 25, 2013. (*Id.*) Plaintiff then filed a written request for hearing on January 14, 2014. (*Id.*) Plaintiff appeared and testified at a hearing held on June 16, 2015, in Jericho, New York. (*Id.*) As discussed *supra*, Ms. DeStefano, an impartial vocational expert, also appeared and testified at this hearing. (*Id.*) After this

hearing, ALJ Patrick Kilgannon considered plaintiff's case *de novo* and issued a decision on July 31, 2015, finding that plaintiff was not disabled under the Social Security Act. (*Id.* at 12-25.) Plaintiff requested a review of the ALJ's decision by the Appeals Council on September 4, 2015. (*Id.* at 7-8.) On November 9, 2016, the Appeals Council denied plaintiff's request for a review. (*Id.* at 1-3.) The Appeals Council informed plaintiff that the ALJ's decision was therefore "the final decision of the Commissioner of Social Security in [her] case." (*Id.* at 1.)

## B. Instant Case

Plaintiff commenced this lawsuit on December 28, 2016. (ECF No. 1.) On March 30, 2017, plaintiff moved for judgment on the pleadings. (ECF No. 7.) The Commissioner submitted a cross-motion for judgment on the pleadings on June 1, 2017. (ECF No. 10.) On June 22, 2017, plaintiff responded to the Commissioner's cross-motion for judgment on the pleadings. (ECF No. 13.) The Court has fully considered the parties' submissions.

## III. STANDARD OF REVIEW

A district court may set aside a determination by the Commissioner "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (*citing Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in social security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971) (citation omitted); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the

agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## IV. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Social Security Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims.[5] *See* 20 C.F.R. §§ 404.1520, 416.920. The Second

---

[5] The ALJ performs this five-step procedure in the first instance; the Appeals Council then reviews the ALJ's decision and determines if it stands as the Commissioner's final decision. *See, e.g.*, *Greek v. Colvin*, 802 F.3d at 374.

Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual function capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner must consider the following in determining a claimant's entitlements to benefits: "(1) the objective medical facts; (2) diagnosis or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v.*

*Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. The ALJ's Ruling

In the instant case, the ALJ first noted that plaintiff met the insured status requirements of the Social Security Act through December 31, 2016. (AR at 14.)

Next, at the first step in the five-step sequential process described *supra*, the ALJ determined that plaintiff had not engaged in substantial gainful activity since October 16, 2012, the date of the alleged onset of her disability. (*Id.*) The ALJ noted that plaintiff worked after the alleged disability onset date, but that this work activity did not rise to the level of substantial gainful activity. (*Id.*)

At the second step in the five-step process, the ALJ determined that plaintiff had the following severe impairments: left ankle posttraumatic synovitis, lumbar disc protrusion, morbid obesity, asthma, bipolar affective disorder, and depression. (*Id.*) The ALJ determined that plaintiff did not meet her burden of proving that her hypertension, glaucoma, and sleep apnea were severe impairments. (*Id.*)

In reaching the above conclusions, the ALJ noted that the record confirmed that plaintiff had a history of these conditions, but concluded that the record did not demonstrate that the conditions imposed more than minimal functional limitations. (*Id.*) The ALJ pointed to treatment records from Dr. Schaefer, which indicated that plaintiff's blood pressure was "well controlled" and that plaintiff denied headache, dizziness, chest pain, palpitations, shortness of breath, and urinary complaints. (*Id.* at 14-15.) The ALJ also reasoned that the treatment notes from all the providers indicated a history of glaucoma, but did not "document any complaints of symptoms arising therefrom." (*Id.* at 15.) The ALJ further noted that Dr. Ehab, plaintiff's primary care physician, had

specifically noted that plaintiff denied ophthalmologic complaints, including blurred vision, diminished visual acuity flashes of light, pain, and floaters. (*Id.*)

The ALJ also noted that the record showed that plaintiff has been diagnosed with obstructive sleep apnea. (*Id.*) He noted her treatment with a CPAP device at home. (*Id.*) He pointed to treatment notes from Drs. Shaefer and Ehab that indicated that plaintiff specifically denied fatigue and that she appeared alert and oriented. (*Id.*) Based on the evidence mentioned above, the ALJ reached his determination that plaintiff had not met her burden of proving that hypertension, glaucoma, and sleep apnea were severe impairments. (*Id.*)

At the third step of the five-step sequential process, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (*Id.*) The ALJ reasoned that plaintiff's impairment of the ankle did not meet listings 1.02 or 1.06, because the objective evidence did not show an inability to ambulate effectively as defined in section 1.00B2b. (*Id.*) The ALJ went on to conclude that plaintiff's "spinal impairment does not meet listing 1.04, because while the evidence established compromise of a nerve root, it does not show motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and positive straight-leg raising test, [n]or does it show spinal arachnoiditis or spinal stenosis resulting in pseudo claudication." (*Id.*)

The ALJ noted that plaintiff's asthma "[did] not meet listing 3.03 because it has not resulted in chronic asthmatic bronchitis or the prescribed number of attacks requiring physician intervention occurring within the time period specified by the listing." (*Id.*)

The ALJ concluded that the severity of plaintiff's mental impairments, considered singly and in combination, did not meet or medically equate to the criteria of listing 12.04. (*Id.*) In making this finding, the ALJ considered whether the "paragraph B" criteria were satisfied. (*Id.*) To satisfy the "paragraph B" criteria, the mental impairments had to result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (*Id.*) Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. (*Id.*) In evaluating these areas of functioning, the ALJ considered the objective findings in the treatment notes and the consultative examiner's report as well as plaintiff's reports in the record concerning her daily activities and social functioning. (*Id.*) The ALJ found that in activities of daily living, plaintiff had mild restriction, and in social functioning, plaintiff had mild difficulties. (*Id.*) The ALJ found that, with regard to concentration, persistence or pace, plaintiff had moderate difficulties, but had experienced no episodes of decompensation of extended duration. (*Id.* at 15, 16.) The ALJ found that because plaintiff's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria were not satisfied. (*Id.* at 16.)

The ALJ also considered whether the "paragraph C" criteria were satisfied, and concluded that, in this case, the evidence fails

to establish the presence of the "paragraph C" criteria. (*Id.*) The ALJ reasoned that the medical evidence did not show a medically documented history of chronic affective disorder of at least two years' duration that had caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs that were at the time attenuated by medication or psychosocial support. (*Id.*)

Before moving on to step four of the sequential evaluation process, the ALJ first determined plaintiff's residual functional capacity. After careful consideration of the entire record, he found that:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that she can perform: no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching, or crawling. In terms of environmental limitations, the [plaintiff] must avoid exposure to hazards such as moving machinery and unprotected heights as well as concentrated exposure to irritants such as fumes, odors, dust, gas, and poorly ventilated areas. [Plaintiff] is further limited to unskilled tasks in low stress job, (which I have defined as having only occasional decision-making and only occasional changes in work setting).

(*Id.*)

In considering plaintiff's symptoms, the ALJ followed a two-step process, in which an ALJ must first determine whether there is an underlying medically determinable physical or mental impairment. (*Id.*) Second, after finding that an underlying physical or mental impairment(s) that could be reasonably expected to produce plaintiff's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limit plaintiff's functioning. (*Id.* at 17.) Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on the ALJ's consideration of the entire case record. (*Id.*)

In this case, after the ALJ carefully considered all of the evidence, he found, at the first step, that plaintiff's medically determinable impairments "could reasonably be expected to produce the alleged symptoms." (*Id.*) However, he found that she failed at the second step because her statements about the intensity, persistence, or functionally limiting effects were "not entirely credible." (*Id.*)

The ALJ concluded that plaintiff was limited to sedentary work with the above postural limitations based on medical evidence of a left ankle sprain and posttraumatic synovitis, resulting in some residual swelling and limitation of motion of the ankle. (*Id.*) In reaching this conclusion, the ALJ pointed to the medical records from the Southside Hospital Emergency Room on the date of the accident, treatment notes from Dr. Rao, progress notes from Dr. Dicpinigaitis, and medical records from Dr. Hecht. (*Id.* (citing Exs. 1F, 2F, 5F, 14F).) The ALJ also concluded that this impairment reasonably limited plaintiff to standing or walking no more than two hours total over an eight-hour workday and performing no more than occasional postural maneuvers and no climbing of ladders, ropes, or scaffolds. (*Id.* at 17-18.) The ALJ concluded that the medical evidence showed that plaintiff had a left-sided foraminal disc protrusion at L4-5

contacting the exiting left L4 nerve root on MRI, which had resulted in findings of tenderness and restricted range of motion in the lumbar spine. (*Id.*) The ALJ used the treatment notes from Dr. Brandenstein, progress notes from Dr. Dicpinigaitis, examination records from Dr. Wasty, and the records from Dr. Hecht in arriving at this conclusion. (*Id.* (citing Exs. 4F, 5F, 7F, 14F).) The ALJ noted that these conditions reasonably limited plaintiff to lifting and carrying up to ten pounds occasionally throughout the workday. (*Id.*) The ALJ also noted that the medical evidence established that plaintiff has been diagnosed with asthma, and that she has a decreased diffusing capacity of the lungs ("DLCO") on pulmonary function testing.[6] (*Id.*) The ALJ concluded that plaintiff therefore needed to avoid concentrated exposure to environmental irritants. (*Id.*) Finally, the ALJ concluded that plaintiff was limited to unskilled tasks in a low stress job based on her mental impairments and evidence of depression and bipolar affective disorder, with objective findings of a depressed mood, tearfulness, and "mixed" recent memory skills.[7] (*Id.*)

The ALJ noted in his ruling that plaintiff had been diagnosed with morbid obesity. (*Id.*) He further noted that, pursuant to Social Security Ruling 02-1p, he considered any functional limitations resulting from obesity in the residual functional capacity assessment. (*Id.*) He wrote that he had taken plaintiff's obesity into account in limiting her capacity for lifting, carrying, standing, and walking. (*Id.*)

The ALJ did not find a basis to limit plaintiff further. (*Id.*) He reasoned that the medical evidence did not corroborate plaintiff's testimony regarding "extreme difficulty sitting, standing, and walking and very limited lifting and carrying." (*Id.*) The ALJ pointed to medical records indicating that plaintiff was released from Southside Hospital in stable condition the same day that the accident occurred. (*Id.* (citing Ex. 1F).) He also pointed to Dr. Dicpinigaitis's notes from two months after the accident, reflecting that plaintiff was able to walk with a "mild antalgic gait at a normal walking speed." (*Id.* (citing Ex. 5F).) Dr. Dicpinigaitis recorded that plaintiff's ankle was stable to stress upon examination, and that an X-ray showed no obvious fractures, dislocations, or gross arthropathy. (*Id.*) The ALJ also pointed to treatment notes from Dr. Dicpinigaitis from a follow-up visit with plaintiff in October 2013, at which the doctor noted an antalgic gait, but found that the left ankle was stable and unchanged and that plaintiff had five out of five motor strength in her lower extremities. (*Id.*) The ALJ also used Dr. Brandenstein's records in making this conclusion. (*Id.* (citing Ex. 4F).) Dr. Brandenstein noted, in 2013, that plaintiff's spinal range of motion was "actually relatively well maintained with forward flexion to approximately 45-50 degrees." (*Id.*) Furthermore, the ALJ added that, at her examination by Dr. Wasty in late 2013, plaintiff demonstrated a normal gait and stance with no assistive devices, and had full range of motion and no swelling in the left ankle. (*Id.* at 19 (citing Ex. 7F).)

The ALJ found that the treatment notes did not support plaintiff's allegations that she had shortness of breath "all the time." (*Id.*) The ALJ pointed to Dr. Shaefer's notes, which showed that plaintiff consistently

---

[6] The ALJ pointed to the medical records of Dr. Anwar in reaching this conclusion. (AR at 18 (citing Ex. 10F).)

[7] The ALJ pointed to the treatment notes of Dr. Brandenstein and the treatment records from the Catholic Charities Mental Health Services in reaching this conclusion. (*Id.* (citing Exs. 4F, 9F, 19F).)

denied shortness of breath, wheezing, and cough. (*Id.* (citing Ex. 15F).) The ALJ noted that Dr. Schaefer repeatedly found that plaintiff's lungs were clear on examination. (*Id.*) Dr. Hanna also consistently noted that plaintiff denied shortness of breath, both at rest and on exertion. (*Id.* (citing Ex. 18F).) The ALJ wrote that, although the pulmonary function testing Dr. Anwar performed showed decreased DLCO, it also showed normal flow and volume. (*Id.*) For the reasons mentioned above, the ALJ concluded that the medical evidence did not corroborate plaintiff's testimony that she had shortness of breath "all the time" and that she had asthma attacks that resulted in loss of consciousness. (*Id.*)

The ALJ also concluded that the medical evidence did not support plaintiff's testimony regarding her psychiatric impairments, including her allegations of auditory hallucinations and her inability to leave her home. (*Id.*) The ALJ discussed Dr. Schaefer's notes in reaching this conclusion. (*Id.*) He first noted that there was no evidence of psychiatric symptoms until July 2013, which was after the alleged onset date. (*Id.* (citing Ex. 4F).) Plaintiff reported to Dr. Schaefer frequent crying, lack of motivation, poor concentration, anhedonia, and difficulty concentrating. (*Id.* (citing 15F).) The ALJ pointed to the fact that Dr. Schaefer made no mention of hallucinations in her notes. (*Id.*) The ALJ also noted that Dr. Schaefer found that plaintiff was alert and fully oriented, and that her insight and judgment were intact. (*Id.*) Dr. Schaefer prescribed plaintiff Zoloft, and the ALJ noted that, at a follow-up visit with Dr. Schaefer, plaintiff reported that she was feeling better on Zoloft. (*Id.*) Plaintiff reported that she was "more active and more positive," that she was eating and sleeping well, and that her concentration was "better." (*Id.*) Dr. Schaefer observed that plaintiff had a normal mood and effect, that she was alert and fully oriented, and that her insight and

judgment were intact. (*Id.*) The ALJ also pointed to Dr. Schaefer's administration of a PHQ depression screening questionnaire, which reportedly showed "minimal depression." (*Id.*) The ALJ further noted that, according to Dr. Herman's report from October 23, 2013, plaintiff did not report hallucinations. (*Id.* (citing Ex. 6F).) Dr. Herman also found that plaintiff was cooperative and had adequate social skills. (*Id.*) Dr. Herman found that plaintiff's thought processes were coherent and goal-directed, with no evidence of hallucinations, delusions, or paranoia in the setting. (*Id.*)

The ALJ noted that Dr. Ehab recorded at an August 2014 visit that plaintiff had negative thoughts when she ran out of psychiatric medication, but upon examination, Dr. Ehab found that plaintiff was in a "good mood" and alert and oriented. (*Id.* at 20 (citing Ex. 18F).) The ALJ also pointed to the fact that there was no report or mention of hallucinations, and that Dr. Ehab noted that plaintiff was in a "good mood" during her next examination in February 2015. (*Id.*)

The ALJ wrote in his findings that because a plaintiff's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) describes the kinds of evidence, including the factors that he must consider in addition to the objective medical evidence, when assessing the credibility of plaintiff's statements. (*Id.*) The factors are the following:

1. [Plaintiff's] daily activities;

2. The location, duration, frequency, and intensity of [plaintiff's] pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication that [plaintiff] takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, [plaintiff] receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment [plaintiff] uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the [plaintiff's] functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

(*Id.*)

The ALJ reasoned that plaintiff had described daily activities that, at times, were not limited to the extent one would expect given the complaints of disabling symptoms and limitations. (*Id.*) For example, the ALJ pointed to a function report completed on August 6, 2013, almost ten months after the alleged onset date of the disability, in which plaintiff stated that she had no problems with personal care and that she could do laundry and clean in places that did not require bending or climbing. (*Id.* (citing Ex. 4E).) Plaintiff also reported that she went out two to three times a week, and that she could travel alone via walking or public transportation. (*Id.*) She also reported that she could go food shopping and pay bills. (*Id.*) Plaintiff reported that she had no problems getting along with family, friends, neighbors, and authority figures, and that she could follow spoken and written instructions.

(*Id.*) The ALJ also noted that plaintiff testified that for a period after her injury in 2014, in addition to taking classes at Suffolk County Community College, she was working up to ten hours a week under a work-study program. (*Id.*)

The ALJ concluded that the treatment for plaintiff's physical and mental impairments had been relatively conservative. (*Id.* at 21.) The ALJ pointed to the fact that plaintiff's ankle and back pain were treated with localized injections and a course of physical therapy, and that treatment for plaintiff's mental impairments primarily consisted of medication prescribed by a primary care physician. (*Id.*) The ALJ reasoned that plaintiff's allegation of a disabling mental impairment was undermined by the fact that she did not report this impairment at the time the application was filed. (*Id.* (citing Ex. 2E).) Plaintiff stated in the disability report that she had not had any treatment for a mental impairment, and she did not seek medical treatment for psychiatric symptoms until after she applied for disability insurance benefits. (*Id.*)

The ALJ noted that Dr. Dicpinigaitis reported to Worker's Compensation that plaintiff could not return to work because she had a "100% temporary impairment." (*Id.* (citing Ex. 13F).) However, the ALJ did not give this conclusion weight in determining the residual functional capacity, as it was not an evaluation of plaintiff's functioning over 12 or more months. (*Id.*) Dr. Hecht also found on January 27, 2014 that plaintiff remained "totally disabled from her job." (*Id.* (citing Exs. 11F, 14F).) Dr. Hecht reported to the Workers Compensation Board on February 5, 2014, March 10, 2014, April 22, 2014, July 3, 2014, September 2, 2014, October 28, 2014, December 4, 2014, February 27, 2015, and April 17, 2015 that plaintiff had a "100% temporary impairment," and that she could not "return

to work" because of pain and decreased range of motion. (*Id.*) The ALJ gave this little weight in determining the residual functional capacity because these opinions referred to plaintiff's ability to perform her former job, which is not indicative of disability under the Social Security Act. (*Id.*)

Dr. Hecht also noted on December 14, 2014, October 13, 2014, and December 22, 2014, that plaintiff remained "disabled." (*Id.*) The ALJ gave no weight to these assessments, as there is no definition of "disabled" as used by Dr. Hecht. (*Id.*)

The ALJ also noted that Dr. Moriarty examined plaintiff for the Worker's Compensation carrier on January 8, 2013 and found that "[c]urrently plaintiff could work in a modified duty capacity with restrictions in prolonged standing, prolonged walking, and climbing. The [plaintiff] would have weight handling restrictions of 15 pounds." (*Id.* (citing Ex. 3F).) The ALJ gave this assessment "good" weight, as it was consistent with Dr. Moriarty's previous findings of a slight limp, no assistive device, and five out of five plantar flexion strength. (*Id.* at 21-22.) The ALJ noted that Dr. Moriarty did not examine plaintiff's spine, so—taking this fact and plaintiff's testimony about the difficulty she experienced in lifting more than ten pounds into account—the ALJ adjusted the lifting and carrying restrictions downward. (*Id.* at 22.) Dr. Moriarty examined plaintiff again on September 2, 2014, and concluded that plaintiff had a 20% scheduled loss of use of the left foot, due to "chronic ankle sprain with persistent pain and some motor loss." (*Id.* (citing Ex. 16F).) The ALJ gave this opinion no weight, as it did not pertain to disability under the Social Security Act, and the definition of "20% scheduled loss of use" was not set forth in the report. (*Id.*)

Dr. Kelman examined plaintiff for the Worker's Compensation carrier on January 23, 2015. (*Id.*) Dr. Kelman found that plaintiff was capable of returning to work with the following restrictions: "no prolonged walking/standing, excessive stair climbing, vertical ladders, squatting, repetitive bending, or lifting greater than 40 lbs." (*Id.* (citing Ex. 17F).) The ALJ gave this opinion "good" overall weight, but found that plaintiff's spinal impairment and obesity reasonably restricted her ability to lift and carry further than Dr. Kelman found. (*Id.*) The ALJ noted that the other limitations were consistent with Dr. Kelman's findings and the other findings of record. (*Id.*)

Dr. Wasty found that plaintiff had "moderate to marked limitation to squatting and kneeling. She has moderate limitation to long periods of sitting, standing, walking, bending forward, and heavy lifting. She should avoid heavy exertion due to asthma. She should avoid environments with smoke, dust, and all known respiratory irritants due to asthma." (*Id.* (citing Ex. 7F).) The ALJ gave this opinion "partial" weight. (*Id.*) The ALJ noted that the limitations for squatting and kneeling were related to plaintiff's complaint of ten out of ten bilateral knee pain. (*Id.*) However, the ALJ concluded that the medical evidence of record did not establish a medically determinable impairment that could reasonably be expected to produce knee pain. (*Id.*) The ALJ also concluded that the limitation for sitting was inconsistent with plaintiff's conservative course of treatment for her back and her reports of her daily activities that, at the time of the examination, included taking four college courses. (*Id.*) The ALJ further concluded that the remainder of Dr. Wasty's opinion was supported by the examination's findings and the ALJ gave it "good" weight. (*Id.*)

Dr. Herman found that there did not appear to be evidence of significant limitation with respect to plaintiff's ability to follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate simple work-related decisions, or relate adequately to others. (*Id.* (citing Ex. 6F).) Dr. Herman also found that there did not appear to be evidence of moderate limitation with respect to plaintiff's ability to perform complex tasks and appropriately deal with stress. (*Id.*) The ALJ gave this opinion "great" weight, as it was consistent with plaintiff's presentation in Dr. Herman's examination (adequate social skills, neutral mood, coherent thought processes, intact remote memory). (*Id.*) The ALJ also noted that it was consistent with plaintiff's documented positive response to Zoloft and the conservative course of psychiatric treatment. (*Id.*)

The ALJ also gave "little" weight to the opinion of the state agency consulting psychiatrist, who found that plaintiff had a mental impairment that was not severe. (*Id.* (citing Ex. 2A).) The ALJ came to this conclusion because the opinion was inconsistent with that of Dr. Herman, who was an examining source. (*Id.*)

The ALJ next considered the medical opinion statement from Dr. Tolentino. (*Id.* at 23 (citing Ex. 21F).) In a report dated July 9, 2015, Dr. Tolentino found that plaintiff was "unable to meet competitive standards" in most of the areas of functioning required by competitive employment. (*Id.*) The ALJ noted that updated records (submitted June 2015) from Dr. Tolentino's agency, Catholic Charities, documented only two appointments with plaintiff. Plaintiff was examined by a social worker on October 27, 2014, and a nurse practitioner on November 12, 2014. (*Id.*) The ALJ further noted that,

although Dr. Tolentino was listed as the nurse practitioner's supervisor, there was no evidence that Dr. Tolentino had personally examined plaintiff. (*Id.*) Dr. Tolentino also wrote that plaintiff had cancelled nine appointments with Catholic Charities. (*Id.*) The ALJ, therefore, concluded that the evidence did not establish that Dr. Tolentino was entitled to deference as a "treating physician" under 20 CFR 404.1502. (*Id.*) The ALJ further noted that plaintiff's account of her symptoms in the Catholic Charities examinations was vastly different from what plaintiff reported to Drs. Schaefer, Hanna, and Herman. (*Id.*) In the Catholic Charities appointments, plaintiff reported a history of manic episodes and auditory hallucinations. (*Id.*) The ALJ pointed out that these symptoms were "noticeably absent" from the reports of Drs. Schaefer, Hanna, and Herman. (*Id.*) Dr. Schafer's and Dr. Hanna's notes document "minimal" depression with an excellent response to Zoloft. (*Id.*) The ALJ gave Dr. Tolentino's opinion "little" weight, as it conflicted with evidence from multiple other sources. (*Id.*)

At the fourth step of the five-step process, the ALJ concluded that plaintiff was unable to perform any of her past work. (*Id.*) Plaintiff had been employed in the past as a certified nursing assistant, a directory assistance operator, and an order filler for sufficient periods of time to be considered substantial gainful activity and to learn to perform the requirements of the positions adequately. (*Id.*) The vocational expert identified the certified nursing assistant work in the Dictionary of Occupational Titles under code 355.674-014, and testified that it was generally considered medium, SVP 4 work. (*Id.*) The vocational expert identified the directory assistance operator job in the Dictionary of Occupational Titles under code 235.662-018 and testified that it was generally considered sedentary, SVP 3 work. (*Id.*) The vocational expert identified the

order filler job in the Dictionary of Occupational Titles under code 249.362-026 and testified that was generally considered sedentary, SVP 4 work. (*Id.*) The vocational expert then testified that the residual function capacity would preclude plaintiff from performing these jobs, and therefore the ALJ concluded that plaintiff was unable to perform any of her past relevant work. (*Id.*)

Finally, at the fifth step of the five-step process, the ALJ concluded that, after considering plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (*Id.* at 24.) In determining whether a successful adjustment to other work could be made, the ALJ considered plaintiff's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. (*Id.*) The ALJ noted that, if plaintiff could perform all or substantially all of the exertional demands at a given level or exertion, the medical-vocational rules directed a conclusion of either "disabled" or "not disabled" depending upon plaintiff's specific vocational profile. (*Id.*) If plaintiff could not perform substantially all of the exertional demands of work at a given level or exertion and/or has nonexertional limitations, the medical-vocational rules were to be used as a framework for decision-making, unless there was a rule that directed a conclusion of "disabled" without considering the additional exertion and/or nonexertional limitations.[8] (*Id.*) If plaintiff had solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provided a framework for decision-making.[9] (*Id.*) The ALJ noted that "if plaintiff had the residual functional

capacity to perform the full range of sedentary work, Medical-Vocational Rule 201.28 would direct a finding of "not disabled." (*Id.*) The ALJ further noted that plaintiff's ability to perform all or substantially all of the requirements of work had been impeded by additional limitations. (*Id.*) To determine the extent to which these limitations eroded the unskilled sedentary occupational base, the ALJ asked the vocational expert whether jobs existed in the national economy for an individual with plaintiff's age, education, work experience, and residual functional capacity. (*Id.*) The vocational expert testified that, given all of these factors, the individual would be able to perform the requirements of representative occupations such as: "1. Table worker (DOT code 739.687-182), a sedentary SVP 2 occupation with 2,721 jobs in the national economy; 2. Document preparer (DOT code 249.587-018), a sedentary, SVP 2 occupation with 45,835 jobs in the national economy; and 3. Addresser (DOT code 209.587-010), a sedentary, SVP 2 occupation with 7,338 jobs in the national economy." (*Id.*) Pursuant to SSR 00-4p, the ALJ determined that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles. (*Id.*) Based on the testimony of the vocational expert, the ALJ concluded that, considering plaintiff's age, education, work experience, and residual functional capacity, plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy (*Id.* at 24-25.) The ALJ then concluded that a finding of "not disabled" was therefore appropriate under the framework of Medical-Vocational Rule 201.28. (*Id.* at 25.)

The ALJ next concluded that plaintiff "had not been under a disability," as defined

---

[8] *See* SSRs 83-12 and 83-14.

[9] *See* SSR 85-15.

in the Social Security Act, from October 16, 2012 through the date of his decision. (*Id.*)

Finally, the ALJ made the overall conclusion that, based on the application for a period of disability and disability insurance benefits filed on June 24, 2013, plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. (*Id.*)

C. Analysis

Plaintiff challenges the ALJ's conclusion that she has the residual function capacity to perform sedentary work with the ability to remain "on task." Specifically, plaintiff asserts that the ALJ: (1) did not afford adequate weight to the opinion of her psychiatrist, Dr. Tolentino; and (2) improperly evaluated plaintiff's credibility.

1. Opinion of the Treating Physician

The Commissioner must give special evidentiary weight to the opinion of the treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Carter*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual

> examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairments(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Although treating physicians may share their opinions concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the ALJ must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. When the ALJ chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2)); *see also Perez v. Astrue*, No. 07-cv-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources."). A failure by the ALJ to provide "good reasons" for not crediting the opinion of a treating physician is a ground for remand. *See Snell*, 177 F.3d at 133.

The Court concludes that the ALJ in this case gave appropriate weight to the opinions of plaintiff's treating physicians, explaining that he gave "good weight" to some, and articulating good reasons for giving little weight to, or not crediting, others.

The ALJ provided sufficient reasons for not crediting the opinion of plaintiff's psychiatrist at Catholic Charities, Dr. Tolentino—primarily, that she was not entitled to deference as a "treating physician." (AR at 23.) The ALJ pointed out that Catholic Charities records documented only two appointments with plaintiff, one with social worker Hoefling on October 27, 2014, and the other with nurse Blanchard on November 12, 2014. (*Id.* at 23.) The ALJ noted that, although Dr. Tolentino was listed as the nurse practitioner's supervisor, there was no evidence that Dr. Tolentino personally examined plaintiff. (*Id.*) The ALJ also noted that Dr. Tolentino documented that plaintiff had cancelled nine appointments with Catholic Charities. (*Id.*) He therefore gave little weight to her findings that plaintiff

was "unable to meet competitive standards" in most areas of functioning required by competitive employment (*id.*), and that plaintiff would have difficulty working at a regular job on a sustained basis because she "ha[d] auditory hallucinations that interfere[d] in her functioning" (*id.*; *id.* at 531).

Distinguishing "treating physicians" from other physicians, the Second Circuit has made clear that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selin*, 708 F.3d at 419. In *Selin*, the ALJ rejected the treating physician's diagnosis based in part on the opinion of another physician who "performed only one consultative examination." *Id.* The Court held that, in doing so, the ALJ "fail[ed] to provide 'good reasons' for not crediting [the treating physician's] diagnosis," and that failure "by itself warrant[ed] remand." *Id.*; *see also Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) ("[A] consulting physician's opinions or report should be given limited weight . . . because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" (citation omitted)).

In this case, Dr. Tolentino appears to have had even less contact with plaintiff than the consultative physician did in *Selin*. The record here does not provide evidence that Dr. Tolentino ever personally examined plaintiff. For the above reasons, the Court finds that the ALJ correctly concluded that the evidence does not establish that Dr. Tolentino is entitled to deference as a "treating physician."

The ALJ also reasoned that plaintiff's account of her symptoms in the Catholic Charities examinations was "vastly different" from what she reported to Drs. Schaefer, Hanna, and Herman (AR at 23)—doctors

with whom plaintiff had considerably more contact. The ALJ found that plaintiff's account of her history of manic episodes and auditory hallucinations, as relayed in the Catholic Charities examinations, was "noticeably absent" from the reports of Drs. Schaefer, Hanna, and Herman. (*Id.*) Dr. Schaefer's and Dr. Hanna's reports discussed only "minimal depression," with no mention of any manic episodes or auditory hallucinations of any sort. (*Id.*) Both doctors' reports also mentioned a positive response to Zoloft. (*Id.*) Taking these reports into consideration, the ALJ found that Dr. Tolentino's opinion deserved little weight because it was not consistent with other substantial evidence in the record. (*Id.*)

2. Function-by-Function Analysis

Plaintiff argues that the ALJ also erred by failing to conduct a "function-by-function" analysis of plaintiff's residual functional capacity. However, the Second Circuit has explicitly "decline[d] to adopt a per se rule" requiring such a procedure. *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013). In *Cichocki*, the Court wrote that:

> The relevant inquiry is whether the ALJ applied the correct legal standards and whether the ALJ's determination is supported by substantial evidence. Where an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, we agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed.

*Id.* Plaintiff does not point to specific symptoms that the ALJ failed to consider, but rather makes the conclusory allegation that the ALJ failed to determine her ability to "stay on task" and therefore wrongly determined that she was not disabled. In the hearing before the ALJ, plaintiff's attorney argued that plaintiff "would not be able to remain on task due to her psychiatric and chronic pain condition as well as the asthma, within the tolerance set forth by the expert." (*Id.* at 71.) Plaintiff states that "the Judge was required to complete a function by function analysis . . . taking into account all of the claimant's physical and mental impairments in combination." (Plaintiff's Mem., ECF No. 7-1, at 16 (citing *Hernandez v. Astrue*, 814 F. Supp. 2d 168 (E.D.N.Y. Apr. 29, 2011)).) That is exactly what the ALJ did. As discussed *supra*, the ALJ undertook a detailed analysis of plaintiff's "physical and mental impairments in combination," including her foot, ankle, and back injuries, morbid obesity, spinal range of motion, shortness of breath, depression, difficulty concentrating, and alleged hallucinations, among other symptoms. (AR at 16-23.) The ALJ discussed plaintiff's many treating physicians' opinions. (*Id.*)

Therefore, although the Second Circuit does not require the function-by-function analysis that plaintiff requests that this Court apply, the Court finds that the ALJ's analysis was sufficiently thorough to satisfy this standard and is supported by substantial evidence.

3. Credibility of Plaintiff's Testimony

Plaintiff next argues that the ALJ improperly determined that her testimony was "not entirely credible" (*id.* at 17), and that the medical evidence did not corroborate her testimony (*id.* at 19). The Court recognizes, however, that "[i]t is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to

appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citations and alteration omitted). Here, the ALJ found[10] that plaintiff's "medically determinable impairments could be reasonably be expected to produce the alleged symptoms," but that "her statements concerning the intensity, persistence and limiting effects" were "not entirely credible." (AR at 17.)

Plaintiff testified that she fell and injured her ankle and back on October 16, 2012, and that her symptoms had not improved since the date of her accident. (*Id.*) She testified that she was in constant pain, and rated her pain to be an eight or nine out of ten. (*Id.*) Plaintiff further testified that she could sit for up to 20 minutes at a time, stand for only a minute or two at a time, and walk for only ten steps before she had to stop. (*Id.*) Plaintiff testified that she could lift and carry less than ten pounds. (*Id.*) Plaintiff testified that she would be unable to perform any type of job, even one with a sit or stand option, because she was "always, constantly in pain." (*Id.*)

The ALJ concluded that the objective medical evidence did not corroborate plaintiff's testimony regarding "extreme difficulty sitting, standing, and walking and very limited lifting and carrying." (*Id.* at 18.) The ALJ pointed to the medical records of several of plaintiff's doctors in making this determination. First, he pointed to an examination by Dr. Dicpinigaitis in December 2012, just two months after the date of the accident, at which Dr. Dicpinigaitis observed that plaintiff was able to walk with a "mild antalgic gait at a normal walking speed." (*Id.*) Dr. Dicpinigaitis documented that plaintiff's ankle was stable to stress on examination, and that an X-ray

showed no obvious fractures, dislocations, or gross arthropathy. (*Id.*) He also documented an antalgic gait during a follow-up visit in October 2013, but found that the left ankle exam was stable and unchanged, and that plaintiff had a five out of five motor strength in her lower extremities. (*Id.*) The ALJ also pointed to Dr. Brandenstein's records, which indicated that he found plaintiff's spinal range of motion to be "actually relatively well maintained with forward flexion to approximately 45-50 degrees." (*Id.*) Dr. Brandenstein found that plaintiff had five out of five lower extremity motor strength and no focal motor deficits. (*Id.*) The ALJ next discussed an examination by Dr. Wasty on November 18, 2013, at which plaintiff demonstrated a normal gait and stance with no assistive devices. (*Id.* at 19.) Dr. Wasty noted that plaintiff had full range of motion and no swelling in the left ankle. (*Id.*) Upon review of the record, the Court finds that substantial evidence supports the ALJ's conclusion that the objective medical evidence undermined plaintiff's testimony regarding extreme difficulty sitting, standing, walking, and very limited lifting and carrying.

The ALJ also concluded that the objective medical evidence did not support plaintiff's allegations that she had shortness of breath "all the time." (*Id.*) The ALJ pointed to Dr. Schaefer's notes, which reflected that plaintiff consistently denied "shortness of breath, wheezing, and cough." (*Id.*) Dr. Hanna also consistently noted that plaintiff denied shortness of breath, both at rest and during exertion. (*Id.*) Upon review of the record, the Court finds that the substantial evidence supports the ALJ's conclusion that the medical evidence undermines plaintiff's testimony that her

---

[10] The Appeals Council denied review and informed plaintiff that the ALJ's decision was the Commissioner's final decision in her case. *See supra* note 5.

asthma attacks result in loss of consciousness and shortness of breath "all the time."

Finally, the ALJ concluded that the medical evidence did not support plaintiff's testimony regarding her psychiatric impairments, including her allegations of auditory hallucinations and an inability to leave her home. (*Id.*) The ALJ first noted that plaintiff had a positive response to psychiatric medication. (*Id.*) He next noted that there was no evidence of psychiatric symptoms until July 2013, which was after the alleged onset date. (*Id.*) At that point, plaintiff was "upset and tearful" at an appointment, and was referred to Dr. Schaefer. (*Id.*) At her appointment with Dr. Schaefer, she reported frequent crying, lack of motivation, poor concentration, anhedonia, and difficulty concentrating. (*Id.*) Dr. Schaefer's report includes no mention of hallucinations. (*Id.*) Dr. Schaefer found that plaintiff was alert and fully oriented, that she had a normal affect, and that her insight and judgment were intact. (*Id.*) Dr. Schaefer prescribed plaintiff Zoloft. (*Id.*) At a follow-up visit with Dr. Schaefer, plaintiff reported that she was "more active and more positive," that she was eating and sleeping well, and that her concentration was "better." (*Id.*) Dr. Schaefer observed that plaintiff had a normal mood and affect, that she was alert and fully oriented, and that her insight and judgment were intact. (*Id.*) Dr. Schaefer also administered a depression-screening questionnaire, which reportedly showed "minimal depression." (*Id.*) Dr. Herman also administered a psychiatric examination on plaintiff, and, according to Dr. Herman's records, plaintiff did not report hallucinations or manic episodes. (*Id.*) Dr. Herman found that plaintiff was cooperative and had adequate social skills. (*Id.*) Dr. Herman observed that plaintiff had no abnormalities in posture, motor behavior, or eye contact. (*Id.*) Dr. Herman found that plaintiff's thought processes were coherent and goal-directed, with no evidence of hallucinations, delusions, or paranoia in the setting. (*Id.*) August 2014 treatment notes from Dr. Ehab, plaintiff's most recent primary care provider, show that plaintiff had run out of psychiatric medication and was having negative thoughts. (*Id.* at 19-20.) Dr. Ehab noted however, that plaintiff was in a "good mood" and was alert and oriented. (*Id.* at 20.) There was no reference to or mention of hallucinations or manic episodes. (*Id.*) Dr. Ehab also noted in February 2015, during the next documented appointment with plaintiff, that she was in a "good mood." (*Id.*)

The ALJ properly considered the kinds of evidence and factors described in 20 CFR 404.1529(c) when assessing the credibility of plaintiff's statements. Based on this analysis, the ALJ concluded that plaintiff had "described daily activities that, at times, [we]re not limited to the extent one would expect given the complaints of disabling symptoms and limitations." (*Id.*) The ALJ pointed in part to a function report completed on August 6, 2013, almost 10 months after the alleged onset date of the disability. (*Id.*) In this report, plaintiff stated that she had no problems with personal care, and that she could do laundry and clean in places that did not require bending or climbing. (*Id.*) Plaintiff reported that she went out two to three times a week, that she could travel alone via walking or public transportation, that she could go food shopping and pay bills, and that she spent time with others about two times a month. (*Id.*) Plaintiff also stated that she had no problems getting along with family, friends, neighbors, and authority figures, and that she could follow spoken and written instructions. (*Id.*) Plaintiff also testified that, in addition to taking classes at Suffolk County Community College until May 2014, she was working up to ten hours per week under a work-study program. (*Id.*) At the time plaintiff filed her application for social security disability, she did not report

any mental impairment, despite the fact that the disability report specifically requested information about all conditions affecting her ability to work. (*Id.* at 21.) Plaintiff stated in her disability report that she had not had any treatment for a mental impairment, and she did not seek medical treatment for psychiatric symptoms until after she applied for disability insurance benefits. (*Id.*)

In this case, the ALJ undertook the proper credibility assessment, as highlighted in the discussion above. Upon review of the record, the Court finds that substantial evidence (including the objective medical evidence undermining plaintiff's testimony) supports the ALJ's conclusion that plaintiff was not credible in her testimony. In short, because there is substantial evidence that supports the ALJ's credibility determination, there is no basis for the Court to disturb it here. *See, e.g., Gardner v. Colvin*, No. 13–CV–787–JTC, 2014 WL 5149702, at \*7 (W.D.N.Y. Oct. 14, 2014) (the ALJ's credibility assessment "was performed in accordance with the requirements of the Social Security Act, its implementing regulations, and the weight of controlling authority," and "plaintiff was not entitled to reversal or remand on this ground").

V.    CONCLUSION

For the reasons set forth above, plaintiff's motion for judgment on the pleadings is denied. The Acting Commissioner's motion for judgment on the pleadings is granted.

SO ORDERED.

JOSEPH F. BIANCO
United States District Judge

Dated: January 17, 2018

Central Islip, New York

\* \* \*

Plaintiff is represented by Ronald L. Epstein of Grey and Grey, LLP, 360 Main Street, Farmingdale, New York 11735. The Acting Commissioner is represented by Richard P. Donoghue, United States Attorney, Eastern District of New York, 271 Cadman Plaza East, 7th floor, Brooklyn, New York 11201.